*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SHELISA HARRIS,

      Plaintiff-Appellant,

v

EDWIN EDWARD PAWLITZ and THE
TRAVELERS INDEMNITY COMPANY OF
AMERICA,

      Defendants-Appellees.

UNPUBLISHED
May 26, 2022

No. 357097
Oakland Circuit Court
LC No. 2020-179135-NI

Before: BORRELLO, P.J., and SHAPIRO and HOOD, JJ.

PER CURIAM.

In this automobile negligence action involving the no-fault act, MCL 500.3101 *et seq.*, plaintiff appeals as of right, arguing that the trial court erred in its March 9, 2021 opinion and order by granting defendant Edwin Pawlitz's motion for summary disposition under MCR 2.116(C)(10) and dismissing plaintiff's claims against Pawlitz.[1] For the reasons set forth in this opinion, we vacate the trial court's order granting summary disposition in favor of Pawlitz and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

On January 22, 2019, plaintiff was driving her vehicle when her vehicle was struck on the driver's side by Pawlitz's vehicle as Pawlitz attempted to make a left turn from the oncoming lane. According to the police report, Pawlitz was determined to be at fault and was issued a citation. Plaintiff drove her vehicle from the scene of the accident to go to work. Plaintiff testified that she

---

[1] Plaintiff's remaining claims against defendant The Travelers Indemnity Company of America were dismissed with prejudice pursuant to the parties' stipulation in an April 19, 2021 order. Defendant Travelers Indemnity is not a party to this appeal. Because defendant Travelers Indemnity is not a party to this appeal, facts involving Travelers Indemnity will only be discussed as necessary to provide context for the resolution of the issues presented on appeal.

-1-

completed her shift and that she did not feel any pain while she was working. However, when she tried to go to sleep later that night, she could not sleep and felt a "hollowness" in her head. Plaintiff went to work the next day, but she left early and went to the hospital.

Plaintiff's medical records from her hospital treatment in the emergency department on January 23, 2019, indicate that she was diagnosed with a concussion without loss of consciousness. Plaintiff testified in her deposition that the concussion was diagnosed after testing was performed. According to the January 23 records, plaintiff reported having a headache that had been "waxing and waning w[ith] associated sleepiness, loopiness, photophobia, phonophobia," as well as new "midline thoracic pain" that had begun that day. The notes also indicate that plaintiff had a history of "chronic migraines and several concussions." Under review of systems, there was documentation that plaintiff's eyes were "[p]ositive for photophobia and visual disturbance." An x-ray of plaintiff's thoracic spine was performed with the findings that there was no "compression deformity" and "no significant degenerative changes." A CT scan of plaintiff's head was performed with a finding of no "acute intracranial abnormality." Plaintiff testified that she was treated by a neurologist for her concussion, back injury, and neck injury. According to plaintiff, the only issues she had as a result of her concussion consisted of nose bleeds that stopped after approximately one month without medical intervention.

On February 6, 2019, plaintiff underwent imaging studies of her cervical spine. Her medical records indicate that mild to moderate degenerative changes were observed but that there was "[n]o acute osseous abnormality." The observed degenerative changes included "[m]ild to moderate C5-C6 degenerative disc disease" and possible "mild degenerative disc disease at the C4-C5 level." Although not entirely clear from the record, it appears that the February 2019 cervical spine imaging was an x-ray. At her February 27, 2019 medical appointment, plaintiff was continuing to experience headaches and neck pain. An MRI of her cervical spine was ordered.

On March 8, 2019, an MRI of plaintiff's cervical spine was obtained. The report record from this procedure indicates that plaintiff had a disc bulge at C3-C4, a disc herniation at C5-C6, and a straightening of the cervical lordotic curve that could be caused by cervical muscular spasm.

Plaintiff received chiropractic treatment on September 4, 2019, for complaints of headache, lower back pain, middle back pain, and neck pain. These conditions were noted at that time to be "slightly improved." It was determined that plaintiff had sprained ligaments in her cervical spine, thoracic spine, and lumbar spine. Plaintiff also had a "sprain of sacroiliac joint." The treatment record from this visit indicated that plaintiff was "in the acute phase of care" and that the "patient's status is acute." Plaintiff continued to receive chiropractic treatment for these conditions over the next approximately six months, with the conditions being documented as being worse at times and improved at other times. In her treatment notes from October 2, 2019, October 16, 2019, October 23, 2019, October 30, 2019, December 4, 2019, December 13, 2019, December 18, 2019, January 4, 2020, January 8, 2020, January 15, 2020, and February 5, 2020, plaintiff's "status" was deemed "acute."

There is evidence in the record that plaintiff received chiropractic treatment before the accident that is the subject of this lawsuit. In March 2013, plaintiff received chiropractic treatment for complaints that her lower back was "tightening" when she stood for "long periods of time." In May 2016, plaintiff received chiropractic treatment for complaints of headaches, tightness in her

shoulders, and tightness and stiffness in her neck.  Additionally, with respect to plaintiff's previous history of medical treatment, plaintiff was treated at the hospital in the emergency department in September 2016, for sudden onset headache and right eye pain.  The treatment note indicated that plaintiff had a history of migraines and sinus infection, that she had not had a migraine "in years," and that she had a concussion 13 years earlier.  The treatment note further indicates that at that time, plaintiff was negative for back pain, neck pain, and back stiffness.

Turning back to plaintiff's medical condition during the time following the subject accident, plaintiff underwent an insurance medical examination on October 29, 2019, performed by Dr. Alex M. Steinbock, D.O.  Steinbock is board certified in neurology.  Steinbock's report indicates that plaintiff refused to answer most questions about her general medical history, her family history, her treatment following the accident, her present treatment, her current doctor, present complaints, and her symptoms related to the concussion.  Steinbock quoted plaintiff as stating that she was advised by her attorney not to answer certain questions.  Although plaintiff admitted that she has headaches, she refused to answer Steinbock's question about whether she was prone to headaches before the accident.  Steinbock reviewed medical records from plaintiff's treatment after the accident that also provided information about her medical history, and Steinbock conducted a physical examination of plaintiff.  Steinbock diagnosed plaintiff as follows: "Concussion with reported headaches.  No objective sensory, motor, or reflex abnormality on examination."  Further, Steinbock opined that "Medical documentation does support causal relationship between the claimed accident and the symptoms presented."

Plaintiff underwent another insurance medical examination on November 23, 2019, performed by board-certified orthopaedic surgeon Dr. Jeffrey Devitt, Jr., M.D.  Devitt specifically examined plaintiff's neck and back.  According to Devitt's report, plaintiff indicated that she did not experience pain immediately after the subject accident but started experiencing head, neck, and back pain the next day.  Plaintiff again refused to answer questions about her general medical history.  In describing the records reviewed, Devitt referenced the above-mentioned imaging studies as well as a May 30, 2019 MRI report for plaintiff's thoracic spine showing central disc protrusions.  Devitt stated that plaintiff "was having neck and thoracic pain somewhat acutely." Devitt also noted the findings of disc protrusions and herniations shown in plaintiff's thoracic and cervical MRI studies, as well as the finding in plaintiff's cervical x-ray report indicating that she had degenerative disc disease.  Devitt recommended an independent radiology review of plaintiff's thoracic and cervical MRIs to resolve any apparent contradictions.  He opined that the most likely diagnosis for plaintiff's neck pain was "cervical sprain/strain" and that the "medical documentation discusses a historical relationship of the subjective symptoms to the accident in question."

Plaintiff testified during her deposition that her injuries from the accident had changed her life "dramatically" with respect to "the things that [she] used to do, such as cleaning, and washing, and working at work."  If she sat or cleaned "too long," then her back would start to hurt and she would need to take a break.  Sometimes, she could not go back and finish what she had been doing. The nature of the work she performed in her new position of employment alleviated some of this discomfort.  Plaintiff testified that she did not have a social life before or after the accident.

However, she also testified that she used to go out with her family before the accident to go to "drag bingo, movies, restaurants, that kind of stuff,"[2] that she no longer participated in these activities because of the COVID-19 pandemic, and that her participation in these activities after the accident had been "limited" before the onset of the pandemic. Plaintiff could no longer do things like "bending over squatting." Plaintiff belonged to a women's group at her church, and she continued to participate after the accident. Additionally, plaintiff stated that she had needed more help around the home from her daughter after the accident with tasks such as taking out the trash, washing dishes, doing laundry, mopping, and cleaning the bathroom. Plaintiff acknowledged that her daughter and son[3] had been living with her at the time of the accident and helped with these various chores during that time preceding the accident. However, plaintiff also indicated that she did these chores before the accident and needed more help with them after the accident because of her back injury.

Plaintiff testified that she had never complained of neck, back, leg, or arm pain to any doctor before the accident. She also testified that she had never complained to any doctor of headaches or received medical treatment for any injury before the accident, although she stated that she had a concussion when she was 13 years old. At the time of the accident plaintiff was 47 years old. Plaintiff denied having any difficulties with headaches or cognition after her previous concussion.

When confronted with the indications in her January 23, 2019 medical records that she had a history of chronic headaches and multiple concussions, plaintiff testified that she did not remember any concussions other than the one she suffered when she was 13 years old and that she did not have a history of chronic headaches. Plaintiff further denied any history of sciatica or low back pain before the accident.

Plaintiff initiated this action on January 21, 2020, seeking no-fault and underinsured motorist benefits from Travelers Indemnity and additionally asserting a claim of negligence against Pawlitz.

Pawlitz moved for summary disposition under MCR 2.116(C)(10), arguing that plaintiff could not satisfy the test set forth in *McCormick v Carrier*, 487 Mich 180; 795 NW2d 517 (2010), for establishing a serious impairment of body function. Specifically, Pawlitz asserted that plaintiff could not demonstrate that the motor vehicle accident caused plaintiff to suffer an objectively manifested impairment that affected her ability to lead her normal life and therefore could not sustain her negligence claim against Pawlitz. Plaintiff filed a response opposing the motion, arguing that her deposition testimony and medical records created genuine issues of material fact regarding whether the accident caused a serious impairment of body function such that summary disposition was improper.

The trial court dispensed with oral argument and issued its ruling on Pawlitz's motion for summary disposition in a written opinion and order. After discussing the record evidence, the trial

---

[2] Bingo was apparently not a regular activity for plaintiff but was instead a "one-time thing."

[3] At the time of plaintiff's deposition, her son did not live with her.

-4-

court concluded that plaintiff could not establish that she suffered a serious impairment of body function because she could not demonstrate that the motor vehicle accident caused an objectively manifested impairment that affected her general ability to lead her normal life and plaintiff therefore failed to satisfy the first and third prongs of the test set forth in *McCormick*. The trial court reasoned that plaintiff had not presented any evidence of a "physical basis" for her "subjective complaints of pain and suffering," that plaintiff had not shown that the accident aggravated her preexisting conditions, that the medical records demonstrated that the physical basis for her complaints were degenerative neck and back conditions, that all of plaintiff's restrictions after the accident were "self-imposed," and that there had been no change to plaintiff's work and social life as a result of the accident. The trial court granted Pawlitz's motion for summary disposition under MCR 2.116(C)(10) and dismissed plaintiff's claims against Pawlitz with prejudice. Plaintiff now appeals.

## II. STANDARD OF REVIEW

A trial court's summary disposition ruling is reviewed de novo on appeal. *Latham v Barton Malow Co*, 480 Mich 105, 111; 746 NW2d 868 (2008). Under MCR 2.116(C)(10), a motion for summary disposition may be granted if "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." MCR 2.116(C)(10). "We review a motion brought under MCR 2.116(C)(10) by considering the pleadings, admissions, and other evidence submitted by the parties in the light most favorable to the nonmoving party." *Latham*, 480 Mich at 111. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

## III. ANALYSIS

Pursuant to the no-fault act, a "person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered . . . serious impairment of body function . . . ." MCL 500.3135(1);[4] see also *McCormick*, 487 Mich at 189-190. MCL 500.3135(5) provides:

> (5) As used in this section, "serious impairment of body function" means an impairment that satisfies all of the following requirements:
>
> (a) It is objectively manifested, meaning it is observable or perceivable from actual symptoms or conditions by someone other than the injured person.
>
> (b) It is an impairment of an important body function, which is a body function of great value, significance, or consequence to the injured person.
>
> (c) It affects the injured person's general ability to lead his or her normal life, meaning it has had an influence on some of the person's capacity to live in his

---

[4] The other types of potential threshold injury listed in the statute are not at issue in this case.

or her normal manner of living. Although temporal considerations may be relevant, there is no temporal requirement for how long an impairment must last. This examination is inherently fact and circumstance specific to each injured person, must be conducted on a case-by-case basis, and requires comparison of the injured person's life before and after the incident.

Our Supreme Court held in *McCormick* that there are three prongs that must be established to show a "serious impairment of body function": "(1) an objectively manifested impairment (observable or perceivable from actual symptoms or conditions) (2) of an important body function (a body function of value, significance, or consequence to the injured person) that (3) affects the person's general ability to lead his or her normal life (influences some of the plaintiff's capacity to live in his or her normal manner of living)." *McCormick*, 487 Mich at 215.

Here, the trial court explained its reasoning for granting summary disposition as follows:

> The Court has carefully considered the legal arguments of the parties, as well as the contents of the medical records submitted, the deposition testimony, and the other documentation provided, in the light most favorable to the Plaintiff. Some of the evidence provided was not admissible in its form but was considered for its substance. See *Barnard Mfg. Co. Inc v Gates Performance Engineering, Inc.*, 285 Mich App 362; 373 (2009) which recognized that while evidence offered in response to a motion for summary disposition must be substantively admissible, "it does not have to be in admissible form[ ... ]" provided it is admissible in content. The Court concludes that there is a factual dispute concerning the nature and extent of Plaintiff's injuries, and whether her condition is the result of her alleged injuries. However, the dispute is not material because the Plaintiff cannot satisfy the first or third prong of *McCormick*.

> As stated previously, the plaintiff must introduce evidence demonstrating a physical basis for the Plaintiff's subjective complaints of pain and suffering. The Plaintiff here has failed to do that. The Plaintiff has not provided any expert testimony to support her position and her medical records do not show a physical basis for her pain. Plaintiff argues that when it comes to her head injury, Pawlitz's independent medical examiners concluded that medical documentation supported a causal relationship between the MVA and Plaintiffs symptoms. However, this was only in regard to Dr. Steinbock's neurological assessment and that statement was made without any history of medical treatment or symptoms given by Plaintiff because she refused to give a history. Had Plaintiff reported an honest medical history, it would have included treatment for headaches, migraines, and neck and back pain. Also, Dr. Steinbock did not review any preaccident medical records. His conclusion regarding causation is completely unreliable and carries little, if any, weight due to Plaintiff's obstructions and omissions, and due to the fact that he did not have any pre-MVA records. The same is true for Dr. DeVitt's opinion regarding causation because the Plaintiff denied any pre-existing conditions and Dr. DeVitt did not have any records to review that predated the MVA. Plaintiff has not presented any medical testimony from her own experts or her treaters.

Plaintiff has a well-documented history of migraines and headaches. She has not shown that the MVA aggravated any of these conditions or that a different physical basis for the migraines and pain manifested after the MVA. Further, she has a documented history of neck and back pain and the medical records show that that the physical basis for the Plaintiff's complaints after the MVA are degenerative. The Plaintiff has failed to produce evidence to overcome her burden as to the first prong of *McCormick*.

Relevant to the third prong, an impairment affects a person's general ability to lead his or her normal life when it "[has] an influence on some of the person's capacity to live in his or her normal manner of living." *Id*. at 202. To meet this standard, a person's general ability to lead his or her normal life must be "affected," but it need not be destroyed. *Id*. Consequently, a Plaintiff need not necessarily show that the impairment caused the complete cessation of a pre-accident activity or lifestyle element; rather, courts should also consider "whether, although a person is able to lead his or her pre-incident normal life, the person's general ability to do so was nonetheless affected." *Id*. Further, "there is no quantitative minimum as to the percentage of a person's normal manner of living that must be affected" and there is no temporal requirement regarding how long an impairment must last. *Id*. at 203. Ultimately, whether a person's ability to lead his or her normal manner of living has been affected must be judged by comparison of the Plaintiff's life before and after the incident. *Id*. at 202; *Nelson v. Dubose*, 291 Mich App 496, 499; 806 NW2d 333 (2011). This is a "subjective, person-and-fact-specific inquiry" that must be decided on a case-by-case basis, bearing in mind that "what is important to one is not important to all[.]" *McCormick* at 202, 215-216.

All of Plaintiff's restrictions are self-imposed and she has failed to show that her general ability to lead her normal life has been affected for the reasons argued by Pawlitz in his motion, discussed previously. [Alterations and ellipsis in original.]

Earlier in its opinion, the trial court discussed the evidence pertaining to the third prong in relevant part as follows:

As to the third prong of *McCormick*, Pawlitz points out that all of Plaintiffs restrictions are self-imposed, and that although she testified that she had to work, Pawlitz argues that the statement is not true because Plaintiff had the option to receive work loss benefits from her PIP carrier (who was/is also a Defendant in this lawsuit). Pawlitz argues that although Plaintiff's ability to clean her house may have been affected, it has not affected her ability to lead her normal life because her daughter helped prior to the MVA and she continues to help now. Pawlitz argues that Plaintiff's social and work aspects of her life have not changed at all.

In response, the Plaintiff argues that she was initially diagnosed with concussion and cervicalgia; she treated at Henry Ford Hospital on January 23, 2019 (the day after the MVA) and was diagnosed with nonintactable (sic) headache, MVA and concussion. The Plaintiff alleges that she followed up at Henry Ford

-7-

Hospital on February 9, 2020 for imaging of her cervical spine at the request of Dr. Giancarlo. The Plaintiff points the Court to Exhibit C as support for this allegation. Exhibit C does not contain any medical records from February 9, 2020 but there is a record of cervical spine imaging done on February 6, 2019, so the Court has assumed that Plaintiffs brief contained a clerical error (typo) as to that record. The February 6, 2019 Henry Ford record states the impression as "No acute osseous abnormality. Degenerative changes, as above." There is a noted clinical history of "cervicalgia". The Plaintiff alleges that she had an MRI performed and was diagnosed with a bulging disc at C3-4 and C5-6, with disc herniation, and foraminal stenosis. She was allegedly prescribed physical therapy in November of 2019 and attends water therapy and physical therapy.

The Plaintiff was allegedly given objective diagnoses from Dr. Kern and Dr. Rausch[5] and was diagnosed with impairments with range of motion, soft tissue mobility, strength, flexibility, posture, pain, and joint mobility. The Court uses the word "allegedly" because the Plaintiff cites "Exhibit D" or "Id" in support of most of her allegations regarding her impairments and injuries but fails to point the Court to any specific pages contained in Exhibit D. Exhibit D is 208 pages long and other than listing the place of treatment, the Plaintiff does not specifically reference where the Court can find support for her factual allegations, within those 208 pages. Plaintiff argues that the medical records show that the injuries to her neck and back are objectively manifested. Plaintiff acknowledges that there is some indication of her complaints of pain to her neck and back years prior, but that those prior complaints do not equate to there being no genuine issue of material fact regarding the injuries sustained in the MVA. The Plaintiff argues that Pawlitz cannot escape liability by relying solely on the fact that Plaintiff may have had some pre-existing conditions, because any such conditions were aggravated by this MVA.

Plaintiff testified that her life has changed dramatically. Plaintiff testified that she was terminated from her employment with CVS in March of 2019. There is no allegation that the termination was related to this MVA. She testified that she next worked in a warehouse and scanned products for approximately three months. She voluntarily left employment at that warehouse and does not recall where she worked next. After that, on the date of her deposition, she worked at a company named LumaSmart. At LumaSmart, the Plaintiff testified that she works full time rolling reels for LED lights. She testified that she cannot bend or squat, and that her position at LumaSmart helps ease her discomfort because she can sit, but that she cannot sit for too long because of her back pain. She testified that she worked approximately 10 hours per week of overtime at LumaSmart when she first started but she no longer works overtime because her position changed. She testified that she doesn't have a social life now and that she did not have one prior to the MVA. However, she testified that she would go out with family prior to the MVA non-

---

[5] Jacob Jon Kern, D.C., and Jeffrey Rauch, D.C. treated plaintiff at Rauch Chiropractic (Rauch Chiropractic records, attached as Exhibit D to Response).

regularly, such as for birthdays, and that she was and still is, active in a women's group with her church where they gather every other Friday for activities. She testified that her daughter and son helped her with typical household chores prior to the MVA and that her daughter (her son moved out) helps her more now after the MVA because of her back pain.

It is apparent from the above quoted reasoning by the trial court that its decision to grant summary disposition was based on its own findings of fact after it improperly weighed the conflicting evidence. "[I]t is well settled that the circuit court may not weigh the evidence or make determinations of credibility when deciding a motion for summary disposition. Moreover, a court may not make findings of fact; *if the evidence before it is conflicting*, summary disposition is improper." *Patrick v Turkelson*, 322 Mich App 595, 605; 913 NW2d 369 (2018) (quotation marks and citations omitted; alteration in original). Here, the trial court's discussion of the evidence and its analysis acknowledged that there is conflicting factual evidence in the record. The trial court nonetheless proceeded to engage in a thorough weighing of the relative strength and credibility of the evidence to justify the court's conclusion that plaintiff's case should be dismissed. In doing so, the trial court erred in its approach to deciding this summary disposition motion. *Id*.

With respect to the first *McCormick* prong, the trial court concluded that the medical records did "not show a physical basis for her pain" and any "physical basis" for her pain evident from the medical records was merely a degenerative condition that was not aggravated by the motor vehicle accident. However, the record contains evidence of a March 8, 2019 cervical spine MRI report indicating that plaintiff had a disc bulge at C3-C4, a disc herniation at C5-C6, and a straightening of the cervical lordotic curve that could be caused by cervical muscular spasm. The record also contains evidence that central disc protrusions in plaintiff's thoracic spine were found in a May 30, 2019 MRI. The findings from a January 23, 2019 x-ray of plaintiff's thoracic spine indicate that there were "no significant degenerative changes." Plaintiff's medical records of her February 6, 2019 cervical spine x-ray state that plaintiff was found to have "[n]o acute osseous abnormality," "[m]ild to moderate C5-C6 degenerative disc disease," and possible "mild degenerative disc disease at the C4-C5 level." Devitt acknowledged the apparent discrepancies in the findings from plaintiff's various imaging studies and recommended further radiology review rather than providing a definitive opinion attempting to resolve them.

An "objectively manifested" impairment is "an impairment that is evidenced by actual symptoms or conditions that someone other than the injured person would observe or perceive as impairing a body function." *McCormick*, 487 Mich at 196. As discussed above, there was evidence that certain medical treatment providers found plaintiff to have bulging, herniated, and protruding discs in her neck and upper back (where she reported pain) after the accident. There was also evidence that plaintiff showed signs of degenerative conditions in her cervical spine and that she had been treated for *lower* back pain in 2013 and neck stiffness in 2016. A subsequent medical record from 2016 when plaintiff was treated for a headache indicates that she was negative for back and neck pain at that time.

Accordingly, there was evidence from which a reasonable trier of fact could conclude that plaintiff suffered an objectively manifested impairment that was observable or perceivable by someone other than plaintiff in the cervical and thoracic spine MRIs. *Id*. Yet, the trial court disregarded this evidence and chose instead to credit only the evidence indicating that plaintiff had

degenerative conditions. There was conflicting evidence about the nature of plaintiff's neck and upper back impairments, which is clearly a material fact in this case. To be "material," the disputed fact need not be "outcome determinative" but it "should be significant or essential to the issue or matter at hand." *McCormick*, 487 Mich at 194 (quotation marks and citation omitted). By resolving this material factual dispute on summary disposition through resort to weighing the evidence and making findings of fact, the trial court erred. *Patrick*, 322 Mich App at 605.

In addition to improperly weighing the conflicting evidence, the trial court also seemingly decided to disregard plaintiff's relevant medical record evidence that plaintiff's neck and thoracic spine impairments were observable or perceivable because the trial court found that plaintiff failed to provide sufficiently specific citations to the location of this evidence in the record.

Pursuant to MCR 2.116(G)(4), a "motion under subrule (C)(10) must specifically identify the issues as to which the moving party believes there is no genuine issue as to any material fact," and "[w]hen a motion under subrule (C)(10) is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his or her pleading, but must, by affidavits or as otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial." "If the adverse party does not so respond, judgment, if appropriate, shall be entered against him or her." MCR 2.116(G)(4). This court rule "squarely places the burden of identifying the issues and evidentiary support on the parties, not the trial court." *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 376; 775 NW2d 618 (2009).

Although MCR 2.116(G)(5) requires that the "affidavits, together with the pleadings, depositions, admissions, and documentary evidence then filed in the action or submitted by the parties, must be considered by the court when the motion is based on subrule (C)(1)-(7) or (10)," this Court has held that MCR 2.116(G)(5) does not require the trial court to "scour the record to determine whether there exists a genuine issue of fact to preclude summary disposition," *Barnard Mfg*, 285 Mich App at 381 (quotation marks and citation omitted). This Court explained in *Barnard Mfg*:

> Because MCR 2.116(G)(4) places the burden to establish a genuine issue for trial on the adverse party, MCR 2.116(G)(5) cannot be construed to place a concomitant burden on the trial court to scour the lower court record in search of a basis for denying the moving party's motion. Instead, MCR 2.116(G)(5) must be understood to impose a limitation on the discretion of the trial court rather than impose an affirmative duty. Accordingly, if a party refers to and relies on an affidavit, pleading, deposition, admission, or other documentary evidence, and that evidence is "then filed in the action or submitted by the parties," the trial court must consider it. [*Barnard Mfg*, 285 Mich App at 377, quoting MCR 2.116(G)(5).]

In *Barnard Mfg*, this Court addressed the question "whether the trial court properly considered only the facts brought to its attention by the parties on the motion for summary disposition or whether the trial court had an independent duty to examine the entire record for facts that *might* establish grounds for denying [the plaintiff's] motion." *Barnard Mfg*, 285 Mich App at 364 (emphasis added). In responding to the plaintiff's summary disposition motion in the trial court, the defendants did not reference, cite, or attach "a single piece of evidence" to support their assertion that a genuine factual dispute existed regarding the plaintiff's claims. *Id*. at 374-375.

On appeal, the defendants argued that the trial court erred by granting summary disposition in favor of the plaintiff. *Id*. at 375. This Court explained that although the defendants had "failed to set forth any facts establishing a genuine issue of disputed fact," the defendants nonetheless contended that "the trial court had a duty [under MCR 2.116(G)(5)] to *independently* consider *all* the evidence contained in the court record before it could grant the motion." *Id*. at 375-376. The defendants maintained on appeal that the record did, in fact, contain evidence creating a question of fact that precluded the trial court from granting summary disposition. *Id*. at 376. This Court agreed upon a thorough examination of the record that "there was evidence in the record that could have been used to establish a [material] question of fact." *Id*. at 380. However, neither party had referred to, cited, or otherwise made the trial court aware of the relevant evidence in the record that would have created a question of fact, *id*. at 380, and this Court determined that the trial court thus did not err by granting summary disposition to the plaintiff because the defendants had failed to meet their obligation of timely presenting the relevant evidence to the trial court, *id*. at 381. This Court concluded "that the trial court did not have an independent duty to examine the entire record *for facts that might warrant denying the motion*." *Id*. at 364 (emphasis added).

Here, the trial court accurately stated that the record contains numerous medical records and that plaintiff's trial court brief in response to Pawlitz's summary disposition motion did not provide a specific page within these voluminous medical records for locating the evidence quoted or referenced by plaintiff. The evidence referenced in plaintiff's response included the cervical spine MRI report finding a bulged disc and a herniated disc. However, unlike the defendants in *Barnard Mfg*, plaintiff in this case specifically referenced this evidence and argued that it created a genuine issue of material fact regarding whether plaintiff suffered a serious impairment of body function. Undoubtedly, like this Court, the trial court was likely stymied in its review of the evidence by plaintiff's failure to make her evidence in support of her position easier to locate. However, plaintiff did specifically refer to this evidence and submitted it into the record. It was clear that the trial court was aware of this evidence, since it specifically referred to it in its opinion and order and this evidence was referenced in Devitt's report, which the trial referenced in detail. Plaintiff also cited Devitt's report, and specifically Devitt's description of the MRI showing the thoracic disc protrusions, to support her position.

Although the trial court had no duty to scour the record for evidence to support plaintiff's position about which the trial court was unaware and that *might* show a question of fact, *Barnard Mfg*, 285 Mich App at 364, the trial court could not willfully ignore such evidence having been made aware it, *id*. at 378 (stating that "the trial court could not refuse to consider documentary evidence properly filed by one of the parties") (citation omitted); see also *id*. at 371 ("Although the evidentiary support could have been better organized and presented, [the plaintiff's] submissions also adequately supported its motion under MCR 2.116(C)(10) with regard to its claims of breach of contract and account stated."). Accordingly, the trial court erred by determining that there was no question of material fact that plaintiff could not satisfy the first *McCormick* prong. *West*, 469 Mich at 183.

Next, the trial court also concluded that plaintiff failed to establish a genuine question of fact regarding causation. A plaintiff must prove causation as a necessary element of establishing a negligence claim. *Case v Consumers Power Co*, 463 Mich 1, 6; 615 NW2d 17 (2000). Proving causation requires the plaintiff to establish "that the driver's conduct was both a cause in fact and a legal cause of his injuries." *Wilkinson v Lee*, 463 Mich 388, 391; 617 NW2d 305 (2000).

Here, there was evidence showing that plaintiff had bulged, herniated, and protruding discs after the accident, along with the evidence that plaintiff had not been experiencing back or neck pain recently. Additionally, there was evidence that plaintiff's thoracic spine pain started the day after the accident, that she had no degenerative conditions in her thoracic spine, and that her neck and thoracic spine issues were acute following the accident. Devitt noted the evidence of both degenerative conditions and bulged, herniated, and protruding discs, and Devitt opined that further radiology review was recommended to resolve the question of the extent to which plaintiff's conditions were potentially attributable to degenerative or accident-related causes.

A trier of fact could reasonably infer from the above evidence that plaintiff suffered either new back and neck impairments or an aggravation of preexisting conditions as a result of the accident. "Although causation cannot be established by mere speculation, a plaintiff's evidence of causation is sufficient at the summary disposition stage to create a question of fact for the jury if it establishes a logical sequence of cause and effect, notwithstanding the existence of other plausible theories, although other plausible theories may also have evidentiary support." *Patrick*, 322 Mich App at 617 (quotation marks and citations omitted). Our Supreme Court has held that "[r]egardless of the preexisting condition, recovery is allowed if the trauma caused by the accident triggered symptoms from that condition." *Wilkinson*, 463 Mich at 395. "Causation is an issue that is typically reserved for the trier of fact unless there is no dispute of material fact." *Patrick*, 322 Mich App at 616.

Here, the trial court's conclusion that causation had not been established was based on its finding that plaintiff's conditions were entirely preexisting and degenerative as a matter of law. As explained above, the trial court reached that conclusion after finding not credible or of little weight, evidence that conflicted with that viewpoint, causing the trial court to improperly weigh conflicting evidence and resolve disputed questions of fact to reach its conclusion on causation, contrary to the proper standards for deciding a motion for summary disposition. *Id*. at 605. Because there were questions of fact regarding causation, the trial court erred by granting summary disposition on this basis. *West*, 469 Mich at 183; MCR 2.116(C)(10).

Regarding the third *McCormick* prong, the trial court concluded that plaintiff could not satisfy this prong because her "restrictions are self-imposed and she has failed to show that her general ability to lead her normal life has been affected for the reasons argued by Pawlitz . . . ." Although the trial court discussed plaintiff's evidence that she could not bend, squat, sit too long, or perform all of the work around the house that she previously did, as well as the evidence that plaintiff required more help from her daughter with housework than she had needed before the accident, the trial court nonetheless credited Pawlitz's assertion that the social and work aspects of plaintiff's life had not changed. The trial court focused on evidence that plaintiff's daughter had also helped plaintiff with housework before the accident, while ignoring evidence that the degree of help provided by plaintiff's daughter had increased after the accident. Hence, the trial court's decision on the third *McCormick* prong was also based on improper weighing of the credibility and strength of conflicting evidence contrary to the proper legal standards to be applied in deciding a motion for summary disposition. *Patrick*, 322 Mich App at 605.

Moreover, the statute only requires with respect to the third prong (1) "that a person's general ability to lead his or her normal life has been *affected*, not destroyed" and (2) "that some of the person's *ability* to live in his or her normal manner of living has been affected, not that some

of the person's normal manner of living has itself been affected." *McCormick*, 487 Mich at 202. "[T]he statute does not create an express temporal requirement as to how long an impairment must last in order to have an effect on the person's general ability to live his or her normal life." *Id*. at 203 (quotation marks omitted). As discussed above, there was evidence creating a genuine issue of material fact that plaintiff's general ability to lead her normal life was affected. *West*, 469 Mich at 183.

Vacated and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction. Plaintiff having prevailed may tax costs. MCR 7.219(A).


/s/ Stephen L. Borrello
/s/ Douglas B. Shapiro
/s/ Noah P. Hood