*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

BRENDAN KREFT,

        Plaintiff-Appellee,

v

TREY MICHAEL RIDGWAY and JAMES LEE RIDGWAY,

        Defendants-Appellants.

UNPUBLISHED
August 31, 2023

No. 361178
Oakland Circuit Court
LC No. 2020-182592-NI

Before: O'BRIEN, P.J., and CAVANAGH and MARKEY, JJ.

PER CURIAM.

Defendants appeal by leave granted[1] an order granting plaintiff's motion for judgment notwithstanding the verdict (JNOV) in this third-party automobile negligence action. We reverse and remand for reinstatement of the jury verdict and the judgment of no cause of action in favor of defendants.

## I. BACKGROUND

On July 29, 2020, plaintiff, Brendan Kreft, filed his complaint alleging that, on May 29, 2018, at about 6:50 p.m., defendant Trey Michael Ridgway (Ridgway) negligently operated the motor vehicle owned by his codefendant, James Lee Ridgway, by running off of the road and crashing into a tree at the intersection of Rood Road and Mackey Road in Oakland County. Plaintiff, a passenger in the vehicle, further alleged that he sustained injuries which constituted a serious impairment of an important body function.

On August 24, 2020, plaintiff filed his initial disclosures pursuant to MCR 2.302(A), stating that defendant Ridgway "carelessly reached into the backseat of his vehicle while driving to open a sandwich and subsequently crashed into a tree." Plaintiff claimed that he sustained

---

[1] *Kreft v Ridgway*, unpublished order of the Court of Appeals, entered November 3, 2022 (Docket No. 361178).

-1-

injuries which constituted a serious impairment of an important body function, including: "right sided pneumothorax-requiring surgery, three posterior rib fractures at levels 7, 8, and 9, body rashes, bruising, chest scar, compression fracture to his lumbar spine at L2-L3."

No pretrial dispositive motions were filed and a jury trial began on October 5, 2021. Plaintiff's first witness was Allison Kreft, plaintiff's mother. Allison testified that, before the motor vehicle accident, plaintiff played on the varsity high school baseball team and on a travel baseball team. On the day of the accident, he had gone with friends to watch a girls soccer game when the car he was riding in went off of the dirt road about a 100 feet from the school parking lot and struck a tree. Plaintiff was taken by ambulance to the hospital and it was determined that he had a collapsed lung requiring a chest tube to be inserted. Plaintiff was in the hospital from that Tuesday until Friday of the same week, June 1, 2018. While there, he had pain when trying to sit and when moving around. The first few days at home, plaintiff needed help getting up, moving around, and showering. Plaintiff went to watch his baseball team play the last game of their season on the day after he was discharged, but he used a wheelchair. He also used a wheelchair for a couple days at school. After discharge from the hospital, plaintiff saw a neurologist who said that he had compression fractures in his back and he needed to wear a back brace. Plaintiff wore the back brace in June, July, and part of August of 2018. He was able to get his driver's license in July. He also went for physical therapy in July, and was not taking any daily medications related to his injuries at that time. Plaintiff was unable to play on his travel baseball team that summer, which was the first time he missed a season since he was eight years old. Consequently, he missed out on college baseball recruiting opportunities. That summer of 2018, plaintiff was able to socialize with friends, play video games and basketball, travel, swim, and attend a wedding. Plaintiff was also able to play baseball in August 2018, on the fall league. But plaintiff could not dive for balls, and he had to take Motrin and Tylenol after games and practices which was unusual for him. Plaintiff also played tennis with defendant Ridgway in the fall of 2018, and they remained good friends after the accident. Plaintiff has a scar where the chest tube had been inserted and his one shoulder droops. In 2019, his junior year in high school, plaintiff played a full season of spring varsity baseball. He also played on his travel team and in the fall league.

Plaintiff was the second witness who testified at trial. He testified that, after their baseball game, he and his teammates were on their way to watch a girls soccer game when they were in the accident. Plaintiff was the front seat passenger in the car and defendant Ridgway was driving. Ridgway had pulled out from the school parking lot onto the dirt road when he reached back for a sandwich and the car veered off the road, into a wooded area, and struck a tree. The airbags deployed. Plaintiff mostly had back pain and he had some trouble breathing. He had three broken ribs and a collapsed lung, which required that a chest tube be inserted. He was in the intensive care unit and then the pediatric unit. During the hospital stay, it was hard for him to move around and to sit up. After he was discharged he still had lower back pain and went to a spine specialist who said he had two compression fractures in his spine. He had to wear a back brace, which was constricting and uncomfortable because it made him really sit up straight, but he only wore it for about two weeks. He was not able to play baseball that summer which mentally devastated him. After his discharge from the hospital, he had to sleep in his sister's first-floor bedroom because he could not go up and down stairs. He also needed help to get up from chairs and could not walk around the house much so he just had to sit around. He needed help, including with showering and getting dressed and undressed. Plaintiff testified that he used a wheelchair the first day back

to school only, which was the Tuesday of the following week, but he needed help carrying his bags and could not use the stairs so he used the school elevator.

Plaintiff further testified that during his sophomore year of high school, before this accident, he played on the high school baseball team and was on the powerlifting team which was part of an advanced gym class. He finished second in his weight class in the state competition for powerlifting. After this accident, he returned to the advanced gym class but not powerlifting because he could not lift as much; he was lifting far less than he had the year before and did not feel like he was competitive. Before the accident, his powerlifting stats were always improving but not after the accident. He also could not play baseball in the summer of 2018 and had been seriously considering playing college baseball but he needed to play that summer for recruitment purposes and he could not play. However, he did play baseball the following summer, in 2019, which also was important for recruitment purposes. When he returned to baseball in the fall of 2018, it took time for him to build back up his strength and to get back to the level he had been at before the accident. His performance was not that great when he returned to baseball. In particular, he had a problem swinging the bat because it requires a twisting motion and he had not twisted his torso in a long time; his timing was off. After games and practices he had soreness in his lower back that he never had before the accident. In the fall of 2018, he played tennis on the varsity high school tennis team with defendant Ridgway as his doubles partner. He practiced every day after school and never missed a practice because of back pain. They won some tournaments and even qualified for a state regional tournament. The physical changes he noted since the accident were a scar on his upper right chest from the chest tube and his right shoulder droops, but no doctor had ever related his shoulder droop to the accident and he had no pain or limitations because of it. The accident really put a dent in his life and made him realize that he is not invincible; it made him question choices more carefully. At the time of trial, plaintiff testified, he was a sophomore in college at Kettering University in Flint studying mechanical engineering and it had no baseball team. His aspirations about playing college baseball did not come to fruition. Not playing baseball the summer of 2018 did not help in that regard and, possibly, if he had played things may have turned out differently. Two of his high school teammates played baseball in college and two teammates on his travel team also played in college.

On cross-examination, plaintiff testified that in 2018 when the accident occurred, he was 5 feet, 5 inches tall and weighed about 115 pounds. The last time he sought medical treatment for his accident-related injuries was on August 9, 2018, when he was told he could resume all prior activities which included playing baseball. His first visit to Dr. Ritter was on June 7, 2018—about a week after the accident—and he told the doctor that he had no pain when walking, sitting, or standing. He was prescribed a back brace which he wore for about two weeks. He went to physical therapy on July 2, 2018, and told them that he only wore the back brace for two weeks and that he had no pain or difficulties with activities. On the intake forms, plaintiff noted that he had a little bit of difficulty with running, making sharp turns when running fast, and hopping. Plaintiff went for ten physical therapy visits, after which he had no pain with any activities. Plaintiff's last visit to Dr. Ritter was on August 9, 2018, and plaintiff was told he could return to all activities, including baseball. At the time of trial, plaintiff had not had any treatment for accident-related injuries for over three years. Plaintiff testified that after playing baseball his sophomore year of high school, he did not receive any awards but after playing baseball in his junior year, he received an honorable mention award. Plaintiff also testified that he had never played organized tennis until after his accident when he began playing in the fall of 2018 on the varsity team. He practiced every day

after school and never missed a practice because of back pain. In his junior year of high school, he was named the scholar athlete of his high school.

The third witness called to testify on plaintiff's behalf was his father, Dennis Kreft (Kreft). Kreft testified that he was with plaintiff at the hospital after the accident and plaintiff had a partially collapsed lung (20%), and some broken ribs on the same side. A chest tube was placed and plaintiff was admitted to the hospital. After plaintiff was discharged from the hospital, he used a wheelchair the first few days and needed help getting up from chairs, as well as with showering and dressing. Dr. Ritter had recommended the back brace and plaintiff wore it but it was awkward and uncomfortable. Before the accident, plaintiff played baseball and was a good player; he was a starting pitcher and infielder. He also did powerlifting as part of his advanced gym class and, in a competition, he finished in second place in his weight class. Plaintiff could not play baseball in the summer of 2018 so he missed a crucial time for college baseball recruiting. But plaintiff did play in college-exposure tournaments after his junior and senior years of high school. When he returned to playing baseball in the fall of 2018, however, his performance was noticeably worse than it was in prior years. His mechanics for pitching were different and his bat swing was different. When delivering a pitch, he was falling off the pitcher's mound which was not normal for him. Both his batting average and fielding performance stats were down from years prior. Plaintiff also was not able to compete in powerlifting after the accident because he was not able to lift what he used to lift. In the summer of 2018, plaintiff could not socialize like he was used to; for example, he could not go up north with his friends. He became a bit more introverted after this accident when he realized he was not invincible. And he took more Motrin and Tylenol after activities. Kreft knew of some players who plaintiff played baseball with and had comparable abilities who were playing college baseball.

The final witness called by plaintiff was Dr. Hussein Mazloum, and his video deposition was played for the jury. Dr. Mazloum saw plaintiff in the emergency room on the day of the accident, May 30, 2018. A CAT scan revealed that plaintiff had a small right-sided pneumothorax estimated between five and ten percent—which is a partially collapsed lung. He also had nondisplaced fractures of ribs seven, eight, and nine. A chest tube was inserted to remove the air from his lung cavity. Dr. Mazloum testified that the lung issue could have arisen from the air bag deployment or a fractured rib may have punctured the lung. The chest tube was removed on June 1, 2018, and plaintiff was discharged home. The rib fractures could take six to eight weeks to heal completely and the chest tube procedure would cause scarring both on the skin and on the chest wall. Dr. Mazloum testified that "anytime you have a fracture, you have a pneumothorax, there's an element of scarring and adhesions inside the lungs. . . . So the long-term effect of any injury is usually scarring and adhesions." Because of the risk of infection following the chest tube removal, plaintiff was discharged with restrictions for two to four weeks which included no flying, swimming, or soaking in tubs, as well as limited physical activity to allow his ribs to heal. Dr. Mazloum testified that plaintiff's right shoulder droop could be caused by the blunt trauma of the accident because he was complaining of mid-back pain on the right side in the emergency room which could implicate the involvement of his scapula, nerves, muscles, and tendons but there was no way diagnostically to determine nerve, muscle, and tendon injury.

After the doctor's testimony, plaintiff rested his case and defendants moved for a directed verdict, arguing that—contrary to his claim—plaintiff did not suffer a permanent serious disfigurement, i.e., a threshold injury, as required under the no-fault act. Defendants noted that

-4-

plaintiff was claiming two disfigurements: (1) the drooping right shoulder, and (2) the scar on his chest from the chest tube—neither of which were serious. Further, plaintiff failed to establish that either of these disfigurements were permanent in nature. In fact, plaintiff did not establish with any reasonable degree of medical certainty (possible or plausible is insufficient) that the shoulder drooping issue was related to the accident; medical treatment was not even sought in that regard. Plaintiff responded that, as Dr. Mazloum testified, plaintiff has a scar on his chest that is permanent and, while there is no direct modality to diagnose it, plaintiff's shoulder droop could be related to the injuries he sustained in this accident. The trial court denied defendants' motion, holding that plaintiff testified as to his chest scar and Dr. Mazloum testified as to "the long-term effects and permanent effects of the injuries."

Thereafter, plaintiff moved for a directed verdict, arguing that he suffered a serious impairment of a body function, i.e., an objectively manifested impairment of an important body function that affected his ability to lead his normal life as required under the no-fault act. Plaintiff had two compression fractures in his spine, three broken ribs, and a collapsed lung. Clearly, plaintiff argued, the "ability to use one's back or lungs are important body functions." Further, these injuries affected his ability to lead his normal life because plaintiff had been unable to play baseball in the summer of 2018—which possibly precluded him from playing baseball in college. He also had been unable to go with his friends up north that summer and had been unable to travel by air. Defendants responded, arguing that factual disputes regarding the nature and extent of plaintiff's injuries required the court to deny plaintiff's motion for directed verdict. First, there was no evidence of any impairment caused by the fractured ribs. Second, there was no treatment for the punctured lung after plaintiff was discharged from the hospital. While plaintiff had some physical restrictions for a few weeks after the accident, he was able to participate in many of his normal activities like socializing with friends, getting his driver's license, driving to physical therapy, and going to school. In other words, plaintiff did not have a major impairment and the matter whether he sustained a threshold injury should be submitted to the jury.

The trial court referred the parties to an unpublished case, *Smith v Buerkel*, unpublished opinion of the Court of Appeals, issued April 29, 2021 (Docket Nos. 349874, 350274), which affirmed the trial court's grant of directed verdict in favor of the plaintiff on the issues of serious impairment and causation, and asked the parties to distinguish their legal positions from that case. Defendants argued that in the *Smith* case, the plaintiff was disabled from work for several months because of pain and, in this case, plaintiff had very little pain even days after the accident and then zero pain after five weeks—at which time he also had no functional difficulties with normal activities of daily living. The trial court concluded that whether plaintiff's injuries affected his ability to lead his normal life was a question that should go to the jury; thus, plaintiff's motion for directed verdict was denied.

Following oral arguments, jury instructions, and deliberation, the jury returned a verdict of no cause of action. The jury verdict form indicated that the first question was whether plaintiff's injuries resulted in a serious impairment of a body function and the jury answered in the negative. The second question was whether plaintiff suffered a permanent serious disfigurement as a result of the accident and the jury answered in the negative. On October 20, 2021, a judgment of no cause for action in favor of defendants was entered by the trial court.

On November 10, 2021, plaintiff filed a motion for JNOV or a new trial. Plaintiff argued that there were no disputed facts so the court should have found as a matter of law that plaintiff sustained a serious impairment of body function. In particular, there was no dispute that plaintiff's injuries were objectively manifested and that they affected an important body function. And while defendants challenged whether those injuries affected plaintiff's ability to lead his normal life, the evidence was undisputed—they did. Prior to the accident, plaintiff played baseball in the summer months, participated in competitive powerlifting, went up north in the summer, went swimming, and enjoyed various social activities. After the accident, he was forced to miss school, use a wheelchair for a while, rely on help to get to school classes, miss the last game of his high school baseball season, and miss the summer season of baseball—which was an opportunity to play in front of college recruiters. And even when plaintiff returned to baseball, he was not the same player. Defendants presented no evidence to refute plaintiff's claims. Accordingly, plaintiff argued, he was entitled to an order granting his motion for JNOV or a new trial.

Defendants responded to plaintiff's motion for JNOV or a new trial, arguing that the trial court properly rejected plaintiff's motion for directed verdict—which raised the same issues—after concluding that there were questions of fact for the jury to decide. Ultimately, the jury rendered a verdict in favor of defendants which was supported by competent evidence. Defendants noted that plaintiff only challenged the jury verdict on the issue whether plaintiff suffered a serious impairment of body function and not the issue of permanent serious disfigurement. Defendants argued that plaintiff's injuries did not affect his general ability to perform his normal day-to-day, pre-accident, routine activities because within a month of the accident, plaintiff had no difficulty with bathing, dressing, going to school, squatting, getting in and out of a car, walking, going up and down stairs, standing, sitting, or laying. And within ten weeks of the accident, plaintiff had no pain with any activities, had no further medical treatment, and had no restrictions on any of his activities. Accordingly, defendants argued, plaintiff's motion must be denied.

On January 21, 2022, the trial court entered an opinion and order granting plaintiff's motion for JNOV and ordering a new trial on the issue of damages only. The court concluded that plaintiff suffered a serious impairment of body function as a matter of law. In particular, the court held that plaintiff's injuries affected his general ability to lead his normal life, primarily because he was unable to play baseball for three months and, when he was able to play, he was not at the same competitive level for a while. He also did not return to the sport of competitive powerlifting. In addition, plaintiff had difficulties with some routine activities for up to ten weeks.

On February 4, 2022, defendants filed a motion for reconsideration, arguing that the jury verdict was supported by sufficient evidence and should be reinstated. The jury could have reasonably concluded that within a month of the accident plaintiff was able to lead his normal life, and thus, he did not sustain a *serious* impairment of body function as required for third-party recovery under the no-fault act.

On April 6, 2022, the trial court entered an opinion and order denying defendants' motion for reconsideration on the ground that no palpable error was demonstrated. Subsequently, defendants' motion for stay pending appeal was granted. Thereafter, defendants' application for leave to appeal was granted by this Court. *Kreft v Ridgway*, unpublished order of the Court of Appeals, entered November 3, 2022 (Docket No. 361178).

On appeal, defendants primarily argue that the trial court erred in granting plaintiff's motion for JNOV because the evidence was such that reasonable persons could honestly reach different conclusions on the issue whether plaintiff suffered a serious impairment of body function under the no-fault act; thus, the jury verdict must be reinstated. We agree.

## II. ANALYSIS

### A. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision to grant a motion for judgment notwithstanding the verdict. *Hecht v Nat'l Heritage Academies, Inc*, 499 Mich 586, 604; 886 NW2d 135 (2016). This motion is essentially a challenge "to the sufficiency of the evidence in support of a jury verdict in a civil case." *Taylor v Kent Radiology*, 286 Mich App 490, 499; 780 NW2d 900 (2009). In considering the trial court's decision on the motion, we review the evidence and all legitimate inferences in the light most favorable to the nonmoving party to determine whether the moving party is entitled to judgment as a matter of law—which means that the facts presented preclude judgment for the nonmoving party as a matter of law. See *Wilkinson v Lee*, 463 Mich 388, 391; 617 NW2d 305 (2000); *Nahshal v Fremont Ins Co*, 324 Mich App 696, 719; 922 NW2d 662 (2018). "If reasonable persons, after reviewing the evidence in the light most favorable to the nonmoving party, could honestly reach different conclusions about whether the nonmoving party established his or her claim, then the question is for the jury." *Taylor*, 286 Mich App at 500.

### B. APPLICABLE LAW

The no-fault insurance act, MCL 500.3101 *et seq.*, limits tort liability for noneconomic losses arising out of the ownership, maintenance, or use of a motor vehicle to instances where "the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement." MCL 500.3135(1); see, also, *McCormick v Carrier*, 487 Mich 180, 192-193; 795 NW2d 517 (2010). And, MCL 500.3135(2) states, in pertinent part:

> (a) The issues of whether the injured person has suffered serious impairment of body function or permanent serious disfigurement are questions of law for the court if the court finds either of the following:
>
> (*i*) There is no factual dispute concerning the nature and extent of the person's injuries.
>
> (*ii*) There is a factual dispute concerning the nature and extent of the person's injuries, but the dispute is not material to the determination whether the person has suffered a serious impairment of body function or permanent serious disfigurement.

In *McCormick*, 487 Mich at 215, our Supreme Court set forth a three-pronged test[2] to determine whether a person has shown a "serious impairment of body function." This test requires:

> (1) an objectively manifested impairment (observable or perceivable from actual symptoms or conditions) (2) of an important body function (a body function of value, significance, or consequence to the injured person) that (3) affects the person's general ability to lead his or her normal life (influences some of the plaintiff's capacity to live in his or her normal manner of living). [*Id.*]

This analysis must be conducted on a case-by-case basis in that it is inherently fact- and circumstance-specific. *Id.* In other words, the *McCormick* Court explained, a brief impairment may be devastating to some persons while a near permanent impairment may have little effect to other persons. *Id.* at 215-216. To determine whether an impairment affects the person's general ability to lead his or her normal life, the person's life before the injury must be compared with the person's life after the injury. *Id.* at 202; see also *Nelson v Dubose*, 291 Mich App 496, 499; 806 NW2d 333 (2011). A person's ability must be affected—although not destroyed—and there is neither a minimum percentage of a person's normal manner of living that must be affected nor a durational or temporal requirement. *McCormick*, 487 Mich at 202-203.

## C. APPLICATION

In this case, following the presentation of proofs at trial, plaintiff moved for a directed verdict on the issue of whether he suffered a serious impairment of body function. The trial court denied that motion, holding that whether plaintiff's injuries affected his ability to lead his normal life was a question of fact that must be decided by the jury. In other words, the court recognized there was a factual dispute that precluded the determination as a matter of law. See MCL 500.3135(2). Because a material factual dispute existed, the court sent the question to the jury and the jury returned a verdict finding no serious impairment of body function was suffered by plaintiff. Then plaintiff filed a motion for JNOV and, although no new evidence was presented and the standard of review with regard to both motions is essentially the same, *Nahshal*, 324 Mich App at 719, the trial court granted plaintiff's motion for JNOV.

We conclude that reasonable persons, after viewing the evidence in the light most favorable to defendants as the nonmoving parties, could honestly reach different conclusions about whether plaintiff suffered a serious impairment of body function; specifically, whether the impairment affected his general ability to lead his normal life. Therefore, the issue was properly submitted to the jury for determination and the jury verdict in favor of defendants must be reinstated. If the jury had found in favor of plaintiff, we would likewise affirm that jury verdict. In other words, there was a material factual dispute that was within the province of the jury to resolve.

The record evidence on the issue, considered in the light most favorable to defendants, shows that plaintiff needed some minimal assistance at home during the first few days after getting

---

[2] The Legislature has since codified this three-pronged test at MCL 500.3135(5), but at the time plaintiff's claim accrued, May 29, 2018, this codification was not in effect. 2019 PA 21 (Effective June 11, 2019).

out of the hospital. But he was able to go and watch his baseball team play the day after he was discharged from the hospital. He also returned to high school on the Tuesday following his Friday discharge from the hospital. While he used a wheelchair his first day back to school, it was not needed after that day. Plaintiff was able to socialize with his friends that summer after the May accident, including by playing video games, playing basketball, attending a wedding, and traveling. He also got his driver's license. Although plaintiff was unable to swim or play baseball during June and July, he resumed all activities in August—including playing baseball. But plaintiff chose not to resume competitive powerlifting after the accident. Instead, plaintiff chose to play on the varsity tennis team, where he played well enough to win tournaments. While plaintiff missed out on some college baseball recruiting opportunities by not playing in the summer of 2018 after his sophomore year in high school, he resumed playing baseball in the fall of 2018, and was thereafter involved in several college-exposure tournaments before graduating from high school. And although plaintiff's baseball performance declined somewhat after not playing for a couple months following the accident, he was given an award in recognition of his baseball-playing skills following the 2019 season. He was also named the scholar athlete of his high school during his junior year. Thus, the jury could have found that, although plaintiff sustained injuries in the car accident that required a short hospital stay, some minimal follow-up medical treatment, and some physical restrictions for a short period to permit healing, plaintiff's general ability to lead his normal life was not affected. The record facts did not preclude judgment in favor of defendants as the nonmoving parties as a matter of law. Accordingly, plaintiff was not entitled to judgment as a matter of law and the trial court erred by granting plaintiff's motion for JNOV. We reverse the trial court's order in that regard and remand for reinstatement of the jury verdict and the judgment of no cause of action in favor of defendants.

Reversed and remanded for reinstatement of the jury verdict and the judgment of no cause of action in favor of defendants. We do not retain jurisdiction.

/s/ Colleen A. O'Brien
/s/ Mark J. Cavanagh